# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DIANA THURMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 16-CV-104-TCK |
| | ) |
| JANICE STEIDLEY; | ) |
| LARRY STEIDLEY; and | ) |
| OFFICE OF THE DISTRICT ATTORNEY | ) |
| FOR DISTRICT 12,[1] | ) |
| | ) |
| Defendants. | ) |

## **OPINION AND ORDER**

Before the Court are the Joint Motion to Dismiss of Larry Steidley and Janice Steidley for Lack of Subject Matter Jurisdiction and Failure to State a Claim (Doc. 18).

**I.      Background**

In her Amended Complaint, Plaintiff Diana Thurman ("Ms. Thurman") alleges the following facts. In April 2014, Ms. Thurman's son, Justin Thurman ("Thurman"), was arrested and jailed in the Rogers County Detention Center. Ms. Thurman actively participated in her son's criminal case, including retaining counsel and attending court appearances.

Following a May 2014 hearing regarding Thurman's new criminal charges, an unidentified woman claiming to work for Defendant Janice Steidley, who was then the Rogers County District Attorney ("DA Steidley"), contacted Thurman's mother, Diana Thurman ("Ms. Thurman"). This woman told Ms. Thurman she had reservations about the conduct of the police in Thurman's case and asked if Ms. Thurman was interested in discussing the matter further. Ms. Thurman agreed and

---

[1] On June 20, 2106, Plaintiff voluntarily dismissed Defendant the Office of the District Attorney for District 12. (*See* Doc. 8).

was instructed to meet at the office of DA Steidley's husband, Larry Steidely ("Mr. Steidley"), who is also an attorney. Mr. Steidley and the unidentified woman reviewed Thurman's file with Ms. Thurman and indicated that DA Steidley "wanted to help her son." (Compl. ¶ 9.)

A few days later, Ms. Thurman drove to Claremore Lake to meet DA Steidley and Mr. Steidley (the "Steidleys"). The Steidleys and the unidentified woman were seated in the backseat of a black vehicle. The driver of the vehicle got out and instructed Ms. Thurman to get into the backseat, where the Steidleys told her they wanted to help her son but that they needed something from her. According to the Complaint, the Steidleys revealed their plan to "set up" the Sheriff of Rogers County ("Sheriff"). The Sheriff had led a petition against DA Steidley that resulted in a grand jury investigation and a 74-page report that was critical of DA Steidley.

The Steidleys' alleged plan was for Ms. Thurman to dress provocatively, entice the Sheriff to consume alcohol, and elicit "embarrassing or humiliating statements" from him. (*Id.* ¶ 14.) At the end of this meeting at Claremore Lake, DA Steidley allegedly told Ms. Thurman not to tell anyone about their meeting and that jail is a dangerous place. The unidentified woman told Ms. Thurman that she needed to help them because people died in jail all the time, and it would be a shame to find her son hanging in his cell. Ms. Thurman participated in the scheme over the next several months, meeting with the Sheriff at various public places and reporting back to Mr. Steidley, who would give her further instructions and suggestions. At one point during the scheme, the Steidleys convinced Ms. Thurman to write a false narrative stating that she abused her son in order to help him obtain a better plea deal. Ms. Thurman now believes the Steidleys wanted to use this narrative as additional leverage over her.

At some point after Steidley lost the primary in the next district attorney election, Ms. Thurman contacted the Oklahoma State Bureau of Investigations ("OSBI") and informed it of the

scheme. OSBI urged her to continue the scheme so they could use her as an informant to gather evidence against the Steidleys. In January 2015, DA Steidley left office.

Ms. Thurman alleges the Steidleys caused her "to live in fear of her life, wondering on a daily basis whether her welfare or the welfare of her family was in imminent harm." (Am. Compl. ¶ 24.) She further alleges that the Steidleys' actions caused her to suffer both physically and psychologically; caused damage to her relationships with her son and her husband; and had a negative effect on her financially and emotionally. (*Id.* ¶ 25.) Ms. Thurman asserts two claims for relief against the Steidleys: (1) a 42 U.S.C. § 1983 claim for violation of Ms. Thurman's substantive due process rights ("§ 1983 Claim"); and (2) a *Bosh* claim for violation of article 2, section 7 of the Oklahoma Constitution ("*Bosh* Claim").[2]

## II. Additional Facts Derived from State Court Criminal Records ("State Court Records")

Defendants relied upon state court judicial records – namely, Thurman's criminal record dating back to January 18, 2007 – in support of its motion to dismiss for lack of subject matter jurisdiction and its motion to dismiss for failure to state a claim.[3] Ms. Thurman did not object to the Court's consideration of the records, dispute the records, or even discuss the records in her response to the Steidleys' motion to dismiss.

---

[2] Justin Thurman filed his own lawsuit based on similar facts but alleging the injury of "overdetention" stemming from Defendants' conduct. *Justin Thurman v. Janice Steidley, et al.*, Case No. 16-CV-554-TCK ("16-554"). On June 5, 2017, the Court entered an Opinion and Order (Doc. 33), which is incorporated herein by reference, holding that Justin Thurman lacks constitutional standing to assert 42 U.S.C. § 1983 claims against the Steidleys. The Court declined to exercise supplemental jurisdiction over the remaining state law claims and remanded the case to the District Court for Rogers County, Oklahoma, where it had been originally filed.

[3] The State Court Records are highly relevant to the Court's standing analysis in 16-554. They are less relevant the Court's disposition of this case. Nonetheless, the Court includes this summary because Defendants relied on them in support of their motions to dismiss in both cases.

The State Court Records reflect the following sequence of events. On April 17, 2007, Thurman pled guilty to five charges in CF-2007-294, Tulsa County, Oklahoma. (Steidleys' Mot. to Dismiss, Ex. 1.) On August 26, 2008, Thurman pled guilty to five different charges in CF-2007-5659, Tulsa County, Oklahoma. (*Id.*, Ex. 2.) On October 23, 2013, Thurman pled guilty and was convicted of driving under the influence ("DUI") and transporting an open container of liquor in CF-2013-259 ('2013-259"), Rogers County, Oklahoma, for which Thurman received an eight-year suspended sentence. (*Id.*, Ex. 3.)

On December 3, 2013, Tulsa County District Community Corrections officials filed a "Violation Report" alleging Thurman violated two conditions of his probation related to a one-vehicle accident that occurred on October 28, 2013. As a result of this incident, new criminal charges were filed in CF-2013-00440 ("2013-440"), Mayes County, Oklahoma, for DUI and transporting an open container. The report states:

> Although Thurman continued to use alcohol after being sentenced four days prior on his Rogers County case, this officer feels that be has not had time to get treatment for his addiction. Thurman is scheduled to attend intensive inpatient treatment at the House of Hope in Grove, Oklahoma on December 10, 2013. This officer believes if Thurman abstains from any alcohol consumption, he will be a productive citizen in society. Therefore, this officer respectfully requests Thurman be court-ordered to participate in the SCRAM program for the remainder of his probation and be ordered to complete DUI Court in Rogers County.

(*Id.,* Ex. 4.) On March 10, 2014, Thurman pled guilty and was convicted of driving under the influence ("DUI") and transporting an open container of liquor in 2013-440, for which Thurman received a ten-year suspended sentence with "2 years District Attorney supervised probation." (*Id.*, Ex. 5.)

On April 14, 2014, Chrissie Stone ("Stone"), Drug Court Coordinator, submitted a "Violation Report" in 2013-259 to Judge Sheila Condren and Assistant District Attorney for Rogers County, Timothy Wantland ("Wantland"). This report provides:

> The defendant [Thurman] pled into the Rogers County Drug Court Program on January 27, 2014. At the time of his plea under oath he agreed that he had read and understood the rules of the Rogers County Drug Court Performance Contract. The defendant completed his Drug Court Intake on January 27, 2014. At the time of his intake he once again agreed that he understood the Rules and Conditions of the Rogers County Drug Court. The defendant is in violation of this said contract in the following manner:
>
> Violations:
> 1. The defendant failed to appear for a required Drug Screen on March 29, 2014.
> 2. The defendant had a dilute UA on April 4, 2014.
> 3. The defendant a positive Drug Test for Alcohol on April 8, 2014.
> 4. The defendant failed to appear to his Drug Court Review Docket on April 11, 2014.
> 5. The defendant was instructed to report the Rogers County Drug Court Office by 4:00 PM on April 14, 2014. The defendant failed to report as instructed.
>
> Previous Sanctions:
> 1. The defendant has had no previous sanctions while in the Drug Court Program.
>
> Recommendation: Due to the defendant being AWOL from the Rogers County Drug Court Program it is recommended that the State of Oklahoma file an Application to Remove the defendant at this time.

(*Id.,* Ex. 6.) Also on April 14, 2014, Wantland filed an Application for Removal from Drug Court and Request for Sentencing Pursuant to Plea Agreement in 2013-259, setting forth the same violations described by Stone above. (*Id.,* Ex. 8.)

On April 28, 2014, Thurmam was charged with assault and battery of an officer, resisting arrest, and public intoxication in a new criminal case, CF-2014-283 ("2014-283"), Rogers County, Oklahoma. (*Id.,* Ex. 7.) On August 22, 2014, Judge Condren approved certain modifications to Thurman's Rogers County Drug Court Performance Contract. On September 18, 2014, represented by counsel Ernest Eugene Haynes ("Haynes"), Thurman entered into a plea agreement whereby he entered nolo contendere pleas to the charges in 2014-283. Also on September 18, 2014, Judge Condren sentenced Thurman to six months in Rogers County jail, with credit for time served.

Assuming Thurman was detained on April 28, 2014 following his arrest for public intoxication and assault on an officer, he had served almost five months on the date Judge Condren sentenced him to six months with credit for time served. The State Court Records do not show Thurman's release date. According to the Complaint, Thurman was released on December 3, 2014.

### III. Motion to Dismiss § 1983 Claim

The Steidleys first move to dismiss Ms. Thurman's § 1983 claim under Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") based on her lack of standing and the resulting absence of federal subject matter jurisdiction. The Steidleys also move to dismiss under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") based on the doctrines of absolute immunity and qualified immunity.

#### A. Standing[4]

The Steidleys focused their standing argument on the State Court Records and the absence of "traceability" between the Steidleys' conduct and Thurman's alleged "overdetention" in Rogers County jail. (Mot. to Dismiss 6-9.) For the same reasons explained in the Court's Opinion and Order in 16-554, the Court concludes that any alleged injury suffered by Thurman and/or Ms. Thurman as a result of Thurman's "overdetention" is not fairly traceable to the Steidleys' alleged conduct. (*See* 16-554, Doc. 33.)[5]

However, in their standing analysis, the Steidleys did not acknowledge or address the alleged injuries suffered personally by Ms. Thurman as a result of her forced involvement in the scheme, including living in fear of her life and suffering damage to her family relationships. In contrast to

---

[4] The Court adopts the general standing standards set forth in its Opinion and Order in 16-554 and does not repeat them here.

[5] In addition to the reasoning set forth by the Court in 16-554, it is doubtful that Ms. Thurman could recover under § 1983 for an injury suffered by her son.

Thurman's alleged overdetention injury – which was necessarily caused by other state actors in the Drug Court Program and therefore not plausibly traceable to the Steidleys – Ms. Thurman's alleged injuries are directly traceable to the Steidleys' coercive actions. Therefore, the Court concludes that Ms. Thurman's allegations are sufficient to survive a facial attack on her standing and the Court's subject matter jurisdiction. The Steidleys' Rule 12(b)(1) motion is DENIED.

### B. Absolute Immunity - DA Steidley

DA Steidley argues she is entitled to absolute immunity based on her role as a prosecutor. A prosecutor is absolutely immune when acting as an advocate for the state by engaging in conduct that is "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976). "[A]cts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protection of absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Prosecutorial immunity protects the prosecutor in her role as advocate even if she acted in clear violation of law or "with an improper state of mind or improper motive." *Hart v. Hodges*, 587 F.3d 1288 (11th Cir. 2009) (prosecutor protected by absolute immunity for actions in violation of state court order).

DA Steidley describes her alleged conduct directed toward Ms. Thurman as part of the "plea bargaining process" – presumably, Thurman's plea in drug court. The Court rejects this argument. Nothing about the alleged scheme indicates that DA Steidley was performing a prosecutorial

function.[6] Ms. Thurman alleges that DA Steidley sought her out with a non-prosecutorial aim in mind – namely to set up the Sheriff to do something "humiliating" in order to settle a personal vendetta against him. Ms. Thurman does not allege the Steidleys used her as a snitch or informant to investigate a suspected crime being committed by the Sheriff in exchange for her son receiving a better plea deal. Nor does she allege that the Steidleys were negotiating with Ms. Thurman in any manner. Instead, they were threatening her son's life to gain her assistance in a personal aim that was wholly unrelated to DA Steidley's prosecutorial function. Construing the allegations in their most favorable light, DA Steidley's actions had nothing to do with her role as prosecutor and were certainly not "intimately associated with the judicial phase of the criminal process." *Imbler,* 424 U.S. at 430-31; *Botello v. Gammick*, 413 F.3d 971, 978 (9th Cir. 2005) (prosecutor's attempted interference with school police department in order to ensure certain officer would not participate in investigation not protected by absolute immunity). Therefore, DA Steidley is not entitled to dismissal based on absolute immunity.

C. **Qualified Immunity**

1. **DA Steidley**

DA Steidley alternatively asserts the defense of qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation omitted).

---

[6] Absolute immunity was a surprising argument, given that the Steidleys distanced themselves from the drug court proceedings for purposes of their standing/traceability argument in 16-554. As explained above, the Court found only a speculative, attenuated connection between the Steidleys' alleged conduct toward Ms. Thurman and the drug court process received by Thurman. By the same token, the Court rejects the argument that the scheme alleged involving Ms. Thurman was in any way "prosecutorial" or part of "plea bargaining" in Thurman's case.

In order to survive a motion to dismiss based on qualified immunity, a plaintiff must "allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights, and that those rights were clearly established at the time." *Robbins v. Okla.*, 519 F.3d 1242, 1249 (10th Cir. 2008). "This requires enough allegations to give the defendants notice of the theory under which their claim is made," but "does not mean that complaints in cases subject to qualified immunity defenses must include all the factual allegations necessary to sustain a conclusion that defendant violated clearly established law." *Id.* (internal quotation omitted and emphasis added).

The first question, which is dispositive in this case, is whether Ms. Thurman has alleged facts (assuming they are true) that show the Steidleys plausibly violated her substantive due process rights protected by the Fourteenth Amendment. "Substantive due process arises from the Fourteenth Amendment's protections against governmental deprivations without due process of law." *Williams v. Berney*, 519 F.3d 1216, 1220 (10th Cir. 2008). "Under this framework, due process protections are accorded primarily to matters relating to marriage, family, procreation, and the right to bodily integrity," but also, in rare circumstances, extend to other official conduct "that can be said to be arbitrary in the constitutional sense." *Id.*

"What differentiates a constitutional transgression from an ordinary common law tort" is a level of executive abuse of power that shocks the conscience. *Id.* "[T]he executive abuse represents arbitrary action of government and requires a showing of government officials abusing their power, or employing it as an instrument of oppression." *Id.* "While recognizing no calibrated yard stick, the Supreme Court instructs that the constitutional concept of conscience shocking duplicates no traditional category of common-law fault." *Id.* (internal citations omitted). The conduct "must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing *government* power;" it must also involve "a degree of outrageousness and

a magnitude of potential or actual harm that is truly conscience shocking." *Id.* at 1221 (internal quotations omitted). According to the Tenth Circuit, "little governmental action is held unconstitutional" under this framework. *Id.*

In this case, the allegations state a plausible claim that DA Steidley abused and misused her governmental power. A prosecutor threatening a mother with the death of her detained son to accomplish a personal revenge scheme wholly unrelated to law enforcement objectives easily qualifies as misuse of a district attorney's authority. The more difficult question is whether this abuse of power involved a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking. In most cases involving "conscience-shocking" abuses of executive power, there exists a corresponding physical injury. *See generally id.* at 1223-24 (discussing circumstances in which a physical assault by a government official becomes a constitutional violation and explaining that the "combination of serious physical abuse and the assaulting official's use of official authority to force the victim to submit can shock the conscience"). The nature of the injury certainly plays a role in whether the overall circumstances shock the conscience of the court. *See Busch v. City of Anthon, Iowa*, 173 F. Supp. 2d 876, 889 (N.D. Iowa 2001) (explaining that whether conduct shocks the conscience "depends upon both the nature of the injury or intrusion and the degree to which the intrusion is unjustifiable by any government interest"). For example, if a government employee suffers prolonged sexual abuse under threat of losing a government job, rather than merely being deprived of a vacation day under the same threat, there is a greater magnitude of harm flowing from the conduct and a greater likelihood that a constitutional deprivation has occurred.

Despite that physical assault or injury is typically present in successful substantive due process cases, the Tenth Circuit has not foreclosed the possibility that abuses of power inflicting only

psychological or emotional injury may shock the conscience. In a case involving a teacher calling a student a prostitute in front of the class for several weeks, the Tenth Circuit stated:

> We are unwilling to hold that actions which inflict only psychological damage may never achieve the high level of a brutal and inhuman abuse of official power literally shocking to the conscience . . ., necessary to constitute a substantive due process violation. We can imagine a case where psychological harassment might be so severe that it would amount to torture equal to or greater than the stomach pumping abuse condemned in *Rochin*. But we are sure that the actions alleged in the instant case do not reach that level whether they were done with indifference or with deliberate intent to cause psychological harm. Having said this, if defendant acted as alleged, we strongly condemn his behavior. A teacher who calls a student a prostitute engages in a complete abuse of his authority. To do so repeatedly, and turn a deaf ear as other students follow the teacher's example, is flagrant misconduct. But we must leave plaintiff to whatever relief statutory or state tort law may afford her.

*Abeyta v. Chama Valley Indep. Sch. Dist., No. 19*, 77 F.3d 1253, 1257-58 (10th Cir. 1996) (internal citations and quotations omitted).

Considering the nature of the injury in this case, Ms. Thurman claims the Steidleys' actions caused her to suffer both physically and psychologically; caused damage to her relationships with her son and her husband; and had a negative effect on her financially and emotionally. (Am. Compl. ¶ 25.) It is not alleged that the Steidleys or the Sheriff physically assaulted or touched Ms. Thurman. The Court searched for cases involving arbitrary and abusive threats by government officials that were not accompanied by a physical assault or injury but allegedly caused emotional and relational damages. The cases found by the Court have mixed results. *Compare Pittsley v. Warish*, 927 F.2d 3, 7 (1st Cir. 1991) ("alleged fear or trauma" resulting from police officer's verbal threats to young children that they would never see their mother's boyfriend again not deemed conscience shocking), and *Robbins v. Bureau of Land Mgmt.*, 252 F. Supp. 2d 1286, 1300 (D. Wyo. 2003) (government officials verbally threatening the plaintiff landowner "by telling him not to butt heads with [them] or things would get ugly and come to war" not deemed conscience-shocking), with *Hawkins v.*

*Holloway*, 316 F.3d 777, 787 (8th Cir. 2003) (sheriff who threatened his employees with deadly force and repeatedly pointed his weapon at them as a means of oppression deemed conscience-shocking), and *Grendell v. Gillway*, 974 F.Supp. 46, 51-52 (D. Me.1997) (police officers lying to and verbally threatening an eleven-year-old girl in order to extract incriminating information about the suspected drug use of her parents deemed conscience-shocking).

Ms. Thurman's allegations – assuming they are true and that the evidence will support the most egregious version of events – do not involve a magnitude of potential or actual harm that is truly conscience-shocking. First, the abuse of government power was merely verbal, and no weapons were employed. Second, Ms. Thurman was not physically or sexually assaulted while she participated in the scheme. While participation in this scheme allegedly caused Ms. Thurman mental stress and emotional suffering, the lack of physical harm to Ms. Thurman flowing from the Steidleys' threats or her role in the scheme militates against a finding of a substantive due process violation. Third, the Court does not find the potential harm resulting from DA Steidley's conduct to be of an outrageous magnitude. The risk that Ms. Thurman, an adult woman, would suffer injury while trying to flirt with the Sheriff at public events and then extract humiliating information from him is not overly severe. Although the Steidleys checked in with Ms. Thurman and offered suggestions as to where she could meet the Sheriff, Ms. Thurman retained substantial control of when and how she carried out the scheme. She was not forced to be alone with the Sheriff in a hotel room or a dark alley or any other specifically risk-laden scenario. Nor was she watched or physically intimidated by the Steidleys while she carried out the scheme. Fourth, while the Tenth Circuit has not foreclosed substantive due process violations in cases where there is no physical injury, the Tenth Circuit has indicated that such cases will be rare and require something akin to psychological torture. *Abeyta*, 77 F.3d at 1258 (teacher repeatedly calling student a prostitute in front of class, which allegedly

resulted in severe psychological harm, not conscience-shocking). The emotional injuries inflicted were not akin to torture and, while undoubtedly real, are not of a conscience-shocking magnitude.

To be clear, the alleged abuse of power by DA Steidley is highly disturbing and wholly improper. But the Court must also consider the degree of potential or actual harm resulting from the official action, and this is where Ms. Thurman's Complaint falls short. The Court concludes that Ms. Thurman's allegations fail to state any plausible violation of her substantive due process rights and that she cannot overcome DA Steidely's qualified immunity defense.

### 2. Mr. Steidley

Mr. Steidley also asserts the defense of qualified immunity. However, Mr. Steidley is not entitled to qualified immunity because he was a private actor allegedly involved in a conspiracy with DA Steidley for his own private ends and self-interests. *See Warner v. Grand Cty.*, 57 F.3d 962, 966 (10th Cir. 1995) (approving of cases holding that, where private defendant invokes state law in pursuit of private ends, qualified immunity does not attach); *Felix de Santana v. Velez*, 956 F.2d 16, 20 (1st Cir. 1992) (private defendant who allegedly conspired with district attorney to indict a co-worker for perjury in order to gain control of private cooperative not entitled to qualified immunity even where state actors in the conspiracy were found to have qualified immunity).

### D. Failure to State a Claim - Mr. Steidley

For the same reasons explained above in the Court's analysis of the first prong of DA Steidley's qualified immunity defense, the Court concludes that Ms. Thurman has failed to state a claim against Mr. Steidley for any plausible constitutional violation. Therefore, even assuming Mr. Steidley acted under color of law under a "joint state action" theory as alleged by Ms. Thurman, the allegations do not state any plausible § 1983 claim committed by Mr. Steidley. The Court dismisses the claim against Mr. Steidley with prejudice based on general Rule 12(b)(6) standards and not based on qualified immunity.

**IV.    *Bosh* Claim**

The Court declines to exercise supplemental jurisdiction over the remaining state-law *Bosh* claim.  *See* 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction once district court has dismissed all claims over which it has original jurisdiction); *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.").

**V.    Conclusion**

The Joint Motion to Dismiss of Larry Steidley and Janice Steidley for Lack of Subject Matter Jurisdiction and Failure to State a Claim (Doc. 18) is GRANTED.

The § 1983 claim against DA Steidley is dismissed with prejudice under Rule 12(b)(6) because Ms. Thurman failed to allege any plausible constitutional violation, and DA Steidley is therefore entitled to qualified immunity.

The § 1983 claim against Mr. Steidley is dismissed with prejudice under Rule 12(b)(6) because Ms. Thurman failed to allege any plausible constitutional violation.

The Court declines to exercise supplemental jurisdiction over the *Bosh* claim, and such claim is dismissed without prejudice to re-filing in state court.

This Opinion and Order terminates the litigation, and the Court will enter a Judgment of Dismissal.

**SO ORDERED this 5th day of May, 2017.**

**TERENCE KERN**
**United States District Judge**